**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA**

RODNEY WITHERITE                    CIVIL ACTION LAW

         Plaintiff                    NO.

    VS.

JEFFREY MILLER, RICK BROWN,
RALPH PERIANDI, JOHN DUIGNAN,
MAJOR OLIPHANT, JAMES MURTIN,
M.L. HENRY, HUASCAR RIVERA,
STEPHEN BARILAR, and TINA KOREN        JURY TRIAL DEMANDED

      Defendants


**COMPLAINT**

**INTRODUCTORY STATEMENT**

1. This is a civil rights complaint brought for violations of plaintiff's 1st and 14th Amendment rights. Rod Witherite is a Lieutenant in the Pennsylvania State Police (PSP). He's also a Pennsylvania State Troopers Association (PSTA) representative. He suffered a litany of unlawful retaliatory actions by the defendants above named for improper reasons as addressed in more detail below. He alleges violations of his 1st Amendment rights to speak out on matters of public concern and to petition for a redress of grievances. He additionally alleges 1st Amendment violations of his right, and the subsequent retaliation for the exercise

1

of his right, to associate for expressive purposes. Witherite also alleges violations of his 14th Amendment right to the equal protection of the laws.

## JURISDICTION AND VENUE

2. Original jurisdiction to hear complaints of constitutional violations by state officials, under badge of state authority, employing the remedial statute 42 USC §1983 is conferred on this court by 28 USC §1331 and 28 USC §1343 (a) (3) & (4).

3. Jurisdiction to hear supplemental state claims, if any, is conferred on this court by 28 USC §1367(c).

4. A jury trial is demanded.

5. Punitive damages are demanded of these defendants because their actions were particularly egregious, vindictive, and highly injurious to the plaintiff.

6. Attorneys fees pursuant to 42 USC §1988 are demanded.

7. Venue is in the Middle District because the parties, witnesses, and evidence are common to Luzerne County Pennsylvania which is located within the jurisdiction of the United States District Court for the Middle District of Pennsylvania.

## RIGHTS VIOLATED

8. Plaintiff has a 1st Amendment right to speak out on matters of public concern without suffering retaliation.

9. Plaintiff has a 1st Amendment right to petition for a redress of grievances i.e. to file grievances, seek legal protection, and use the courts to resolve legal disputes, without suffering retaliation.

10. Plaintiff has a 1st Amendment right to associate for expressive purposes under the 1st Amendment.

11. Plaintiff has a right as a Union Rep to enjoy the equal protection of the laws under the 14th Amendment i.e. plaintiff is in a "suspect category" or a "protected class".

## OPERATIVE FACTS

12. On or about the Fall of 2006 the defendant John Duignan (a PSP Major) approached plaintiff Rod Witherite and PSP Sergeant Todd Harman asking them to use PSP criminal databases to access information about his estranged wife's boyfriend. At the same time Duignan asked Witherite and Harman to ask around to see what they could hear in the rumor mill about alleged affairs Duignan was having at the office. Duignan had gotten a young staff member pregnant.

13. Witherite and Harman refused to access the PSP databases (J-Net and NCIC etc.), informing Duignan that to do so was a serious crime and that there was absolutely no probable cause or law enforcement purpose to be served by such illegal activity. They did follow through on Duignan's request to "ask around".

14. Regardless, Duignan replied that he had consulted with then Deputy Commissioner Lieut. Col. Periandi who had told him that it was authorized and okay for him to use the PSP criminal information database is to run a check on Duignan's wife's boyfriend. Notwithstanding Periandi is unlawful blessing which was designed to intimidate him, Witherite told Duignan to tell Periandi he wouldn't do it because it was both a criminal and an administrative violation.

15. Duignan was a favorite of the front office meaning Deputy Commissioner John, a.k.a. "Rick", Brown, Ralph Periandi and the Commissioner who at that time, was Jeffrey Miller.

16. Duignan had personally done some unlawful work for Jeffrey Miller on Cynthia Transue. even though this ended up costing the PSP well over half a million dollars. The aforementioned front office members, including Periandi, were loyal to Duignan and Duignan was not shy about saying that Miller "owes me".

17. Duignan then complained, in an act of retaliation, that Rod and Todd Harmon were "talking about him". The process ended up with what, upon information and belief, was a sham investigation supposedly into Duignan's gross misconduct. However, through the commonplace manipulation of the PSP's IAD procedures, the process was turned against the plaintiff and Harman with Duignan eventually telling them that they would receive supervisory notations from Deputy

Commissioner Periandi for talking about the matter. The decision to initiate an investigation into Duignan was made by Miller and Brown largely because of Edwards' persistent complaints about the inequality of the PSP's investigatory process on the issues surrounding J-Net and NCIC.

18. Meanwhile the plaintiff had reported all of what was occurring to Pres. Bruce Edwards of the PSTA (plaintiff was a Union Rep). Duignan was aware of this as was the front office because Edwards complained there about it.

19. Duignan had been caught in his affairs by his wife who, by virtue of Duignan having PSP i.e. state e-mail at his home, had violated PSP regulations and committed a theft of services in addition to stalking his wife's social acquaintances. The PSP has used this mechanism many times to pursue subordinate PSP members whom they wished to discipline or get rid of. This entire state of affairs was reported to Brown and Miller by Mr. Edwards who was deeply concerned about the unlawful harassment his Union Rep(s) were receiving and the negative implications for his membership.

20. Through pressure deriving from an informal quota for traffic citations Duignan soon succeeded in having Trooper Marty Long do the illegal background checks which not only violated PSP administrative regulations but were criminal violations as well.

21. Miller and Brown were fully aware of what was occurring as it went along but Brown represented to Edwards that he had investigated Duignan and said that "he'd done nothing wrong".

22. On or about December of 2006 Duignan called Witherite at home and told him he had "till four o'clock" to transfer out of the Bureau of Patrol and if he didn't he was "involuntarily transferring you out of this building within Bureau of Patrol to Motor Carrier Assistance (MCA)." Witherite objected, to no avail, and was informed by Duignan that he had until four o'clock because at that time "transfers will end". Witherite quickly put a card in order to transfer to Troop N. This unlawful constructive transfer remains a continuing violation of Witherite's rights since it was forced upon Witherite by Duignan who was backed up by Periandi, Brown, and Miller.

23. Witherite told Duignan that he was being retaliated against because he was a PSTA Rep and because he was a friend of Bruce Edwards PSTA President. Duignan said he didn't care. The official transfer date occurred on or about the end of January or the beginning of February 2007.

24. As alleged above, both prior to and after Witherite's arrival at Troop "N", in February 2007, Duignan called Captain James Murtin who was the Troop Commander there.

25. Murtin in turn called Witherite and told him that he did not want him there at Troop N. Witherite was also called by the defendant Barilar who emphasized that Captain Murtin didn't want Rod at Troop N. Barilar went on to persistently harass the plaintiff as per Murtin's wishes along with Murtin's TAM.

26. However, Witherite had nowhere else to go. It was either take what Duignan assigned him which was MCA or try to go somewhere else. MCA was overseen by Captain Fraley about whom Witherite had complained to Duignan and the PSTA. Fraley's girlfriend worked on a program where the PSP with Miller's, Brown's, and Periandi's knowledge intentionally misspent and misapplied millions upon millions of dollars of federal money. Witherite's other option was to take any transfer he could get which resulted in a constructive i.e. forced transfer, to Troop N.

27. Duignan however called ahead to Troop N during February and March to do whatever he could do to harm, injure and impede Witherite in his career all in retaliation for Witherite refusing to violate criminal statutes and adhering to PSP regulations. After arriving at Troop N plaintiff was subjected to a steady litany of harassment from then until the present day at the hands of all of the defendants.

28. On or about Summer and Fall of 2007 Witherite was involved in a legitimate legal dispute in the courts with his ex-wife over the custody of his son.

29. The trial judges expert witness recommended that plaintiff be given primary custody of the boy.

30. When this occurred plaintiff's ex-wife made a complaint to the PSP that the plaintiff was using his attorney and the court system to take her son away.

31. The defendant's Murtin and Oliphant (in IAD) admitted the complaint was frivolous on its face but took it to the defendant Brown seeking permission to do a "full" IAD investigation on it.

32. When Brown was informed, upon information and belief, he ran the matter by the defendant Miller, and to intentionally harass the plaintiff, and embarking on a fishing expedition hoping to find something to use against Witherite, Brown instructed IAD (Skurkis) to do a thorough IAD investigation on plaintiff, the unlawful basis being that he was lawfully using his attorney and the courts to achieve a lawful civil objective. This was a further violation of Rod Witherite's First Amendment rights by Miller, Brown, Murtin, and Oliphant.

33. Brown used the investigation to get the names of Rod's wife's friends and associates and, acquiring their personal information, he then ran them on the same criminal databases that were also unlawfully used by Duignan and Periandi through Trooper Long. Brown and his associates studied these names to see if Witherite had run them on J-Net, and NCIC etc. Brown on the other defendants were doing anything they could to find something to use against Rod Witherite as

they engaged in an unlawful fishing expedition in violation of his First and Fourteenth Amendment rights. They totally failed. Plaintiff had done absolutely nothing wrong.

34. The defendants, in violation of PSP regulations and the plaintiff's procedural due process rights, refused to give him a copy of any charges against him or of the investigation itself to which he was entitled.

35. Or about October 2007 plaintiff was given the result of the so-called investigation. He was informed that the investigation was unfounded. In fact the investigation into the plaintiff for lawfully using the court system was a retaliatory violation of his First Amendment rights for refusing to break the law and violate PSP regulations on behalf of Major Duignan.

36. At this point Duignan, Brown, Miller, Oliphant, and Murtin had all worked together in various capacities to violate plaintiff's rights. Witherite's First Amendment rights to be free of retaliation for petitioning for redress, speaking out on matters of public concern, equal protection, and associating for expressive purposes had been violated.

37. Plaintiff continued to suffer a litany of harassments at the hands of the defendants.

38. A frequent tool of the defendant Murtin's intentional harassment of plaintiff was the defendant Tina Koren the Troop Administration Manager (TAM).

Koren was a civilian assistant to Murtin who continuously harassed Witherite and his secretary Toni Bender. Koren would constantly pursue plaintiff asking him to account for his time, picking constantly about what he was doing and where he was going etc. No other Lieutenant was mistreated in this fashion. Bilarer did the same. He constantly harassed plaintiff doing anything and everything he could to discourage intimidate and irritate him.

39. On or about the first week of April, 2008 plaintiff was scheduled for a PSTA update training session. Initially harassed extensively about whether he would be permitted to attend he was finally allowed to go with Murtin's permission. There were only two lieutenants in the entire PSP Department who were PSTA representatives, plaintiff was, and is, one.

40. Plaintiff was also harassed extensively on this issue. Murtin and the PSP hierarchy used a persistent gadfly named Lacock to continuously create a hostile work environment, particularly directed at plaintiff and the PSTA. Rod, and others, including one who eventually quit over the threats, were treated to a litany of intentionally created rumors and threats meant to intimidate them in their efforts to support PSTA members and be advocates for their concerns.

41. Edwards and the PSTA had complained extensively about Lacock, who, upon information and belief, was used in his most obstreperous capacity to harass

the plaintiff. Plaintiff was eventually permitted to go to the training as indicated above.

42. Prior to Witherite attending the refresher training he was scheduled to assist Bloomsburg University, in Bloomsburg Pennsylvania, along with six PSP members assigned to him. The purpose was to assist with a Spring Break celebration that had a history of being unruly.

43. Brown appeared as a speaker at the PSTA training. Witherite asked Brown during the training session why PSTA members were treated differently i.e. punished differently than PSP top leaders, making specific reference to a speeding incident on the Turnpike where Miller and Deputy Commissioner McDonough were doing 88 miles per hour and escaped any discipline even after they took the video from the patrol car that memorialized the incident. Witherite was concerned about the disparity in treatment and its impact on PSTA members but even more so was concerned about the public image of the PSP since this incident was in the public domain.

44. Brown was noticeably upset, irritated and angry. Witherite was speaking as a citizen concerned about the image and public persona of the PSP and Brown the knew this matter was of public concern.

45. Edwards had recently given Miller and Brown the names of Witherite and Harman as persons with information about Duignan's misconduct. In

retaliation for Witherite's speaking up at the training session, Brown immediately made Witherite a subject of the Duignan investigation despite the fact that he was clearly a witness and a victim.

46. When Witherite went in to be interviewed in this matter Brown was present. Witherite commented that it had only been a few weeks since he was in PSTA training and he had been told this was going to happen. Brown smiled as he walked over to Witherite and said "you have a thick skin" and then gesticulated as he said "oh you're trying to give me one of these huh". As he spoke Brown made a motion as if Witherite were attempting to penetrate his anus.

47. On June 13, 2008, shortly after assuring Witherite that nothing new was going to be done to him, Murtin called Witherite into his office and ordered him to surrender his gun and his badge, telling Witherite that he was now subject to a new IAD investigation for "hostile work environment". Witherite was further ordered to report to Captain Fraley at Troop H in Harrisburg, who is known to be hostile and unfriendly towards Witherite, but even more relevance is a very close personal friend of Miller's.

48. Witherite was ordered not to talk to anyone in Troop N or to go near anyone there.

49. Upon information and belief the basis of this retaliation, which was effectuated by Miller, Brown, Murtin, and Duignan was based on the following: a.)

Witherite dutifully pursued his duties as a PSTA rep. and, b.) Witherite refused to unlawfully assist Duignan in accessing criminal databases for non-law-enforcement purposes. and, 3.) Witherite spoke out as a public citizen on the public image problems for the PSP resulting from the glaringly disparate treatment of higher-ups from standards of investigation and discipline for lower ranking PSP members. and, 4.) Witherite had been taken off the detail at Bloomsburg University so that Murtin could unlawfully use the state troopers assigned there to move outdoor furnishings at his home. This ended up being reported to the PSP and Witherite was held responsible by the defendants in their eyes.

50. On or around this time the plaintiff took leave.

51. When plaintiff reported to Harrisburg on or about August 2008 he was again refused a gun and a badge. He was not allowed, when off duty, to be dressed in a PSP uniform and could not identify himself as a PSP member to anyone. He was assigned to a small cubicle with a computer in a small area and had no duties assigned to him. Though he was technically permitted to carry a gun on duty the defendants confiscated his gun and badge so he had nothing with which to protect himself.

52. Later, Rod was used to assist on criminal investigatory activities on behalf of the PSP. At that time even though his life was at risk he was not able to have a gun because he was constantly told that it could not be found. He was never given

13

an explanation why even though he asked for the reasons he was subjected to this mistreatment many times.

53. On or about October 2008 the plaintiff Lieutenant Witherite received an anonymous call that none of the investigations against him had been able to yield anything that could be used against him and that "it's not sustained your whole case". He was then ordered to attend a session with the defendant M.L. Henry along with a PSTA representative (attorney Tony Caputo)

54. The defendant Henry told plaintiff he would be going back to Troop N but that he "had to undergo EEO (equal employment opportunity) training. When asked, Mr. Henry would not give Mr. Witherite any explanation or reason for why he was being given "EEO training". Witherite asked Henry if Duignan had his badge and or his gun taken away from him and whether he was being given EEO training for stalking the men that his wife had dated after they had separated. Henry would not answer his question.

55. Forcing Witherite to take EEO training was an egregious retaliation for exercising his protected rights by these defendants in order to unlawfully create a false personnel issue in his file. Further, the training, being administered for absolutely nothing, was a sham consisting not more than 10 minutes of discussion with M.L. Henry.

56. Plaintiff learned that the defendant Miller had ordered the harassing investigations into Witherite after he learned that Witherite had raised the issue of Miller's unlawful misconduct on the Turnpike at the PSTA training session. The Investigator(s) on plaintiff's IADs had told witnesses that "The Commissioner wants this" meaning Miller.

57. The PSTA was extremely upset over the confluence of mistreatment, harassment, and the disparities in the application of investigations and disciplines regarding matters pertaining to Rod Witherite and filed an unfair labor practice against the PSP. The PSTA was extremely upset over why no action was taken against Lacock was extremely abusive to PSTA members while a totally baseless and frivolous investigation was launched into Witherite.

58. At the same time Witherite was being investigated another trooper was being investigated for rape. He was not denied his gun and or his badge. Lacock did not have his gun and/or his badge taken away. John Duignan did not have his gun or badge taken away. The aforementioned tactic is arbitrarily and capriciously applied by Rick Brown on a case-by-case basis depending upon how badly he wishes to harass the PSP member involved.

59. At the conclusion of their meeting Henry, upon directions from Brown, told Witherite that he would have to report to the defendant Major Rivera who was the new Area V Commander.

60. Rivera told Witherite at their meeting the following Monday that Murtin didn't want him back in Troop N and that he was being transferred to the "Hazleton hangar", even though he had been totally cleared, as a "Special Project" person for Rivera. It is noteworthy however that Witherite still had grievances pending at this time. This action conceived and carried out by Brown, Henry, and Rivera was a further violation of plaintiff's rights, more specifically, they were retaliating against him for exercising his First Amendment right to petition for a redress of grievances. They were especially seeking to insult and harass the plaintiff by further instructing him that he could not "go around the Troop N barracks" without permission from Murtin. This unlawful harassing order remains in effect today.

61. Murtin was BPR'd (meaning he was investigated by IAD) over the Summer of 2008 for using uniformed PSP Troopers on state time to work at his home. The six troopers that Murtin unlawfully used were initially told that they were not subjects of the investigation. Upon information and belief it is alleged that they secretly were indeed subjects of the investigation. At the end of the investigation they were told that "it was not sustained on each of them", as if they had possibly done something wrong in following Murtin's unlawful, and in fact even criminal orders. As to Murtin, the finding was "unfounded". The aforementioned is an example of the unlawful arbitrary and capricious manipulation of PSP IAD procedures being used to intimidate PSP members (like

16

plaintiff), to suppress evidence, and to cover-up crimes. These career destroying powers are selectively used against certain members when it suits the purposes of higher-ups in the PSP like former Commissioner Miller, Colonel Brown and the other defendants.

62. All of the defendants individually and as a group worked together to injure the plaintiff because he was an active PSTA representative.

63. Duignan sought to achieve the support of Miller, Brown, Periandi, and Murtin among others to harass intimidate and otherwise retaliate against Rod Witherite as alleged above. These defendants' reasons were, among others to intimidate him and retaliate against him because of his PSTA activities and because of his friendship with PSTA President Bruce Edwards.

64. Miller, Brown, and Duignan in turn engaged the PSP's IAD process as a vehicle to intimidate and retaliate against Witherite for refusing to violate the law in Duignan's schemes to harass his wife, for filing grievances and reporting unlawful PSP activities to the union, and for speaking out on matters of public concern where they violated Witherite's rights of expressive freedom, and his rights to be free of retaliation for speaking out on matters of public concern both as a citizen and as a PSTA rep, and for seeking a redress of grievances.

65. Duignan also enlisted Murtin in his unlawful plans to persistently harass and intimidate Witherite on or about the late Winter and Spring of 2007.

66. Murtin then engaged Barilar and Koren to consistently and persistently harass and nitpick at plaintiff because of his Union membership and activities, and because he exercised his rights to seek a redress of grievances, and because he spoke out on matters of public concern.

67. Henry and Rivera, upon information and belief, overtly responding to Brown's coordination of the activities to retaliate against and intimidate Witherite on behalf of Miller, not only attempted to destroy plaintiff's ability to correspond with his union members, or otherwise perform his duties in accordance with his title and station, but brazenly admitted to him that he was the member of a "protected" class a direct reference to his 14th amendment rights.

68. Miller personally, by and through Brown, retaliated against Witherite because, as a citizen, and also as a PSTA i.e. Union representative, he spoke out on matters of public concern during his PSTA training in April of 2008.

Wherefore plaintiff demands judgment against all defendants for the deprivation of, and for working together to deprive plaintiff of, his federally guaranteed rights as follows:

a. For depriving plaintiff of his right to expressive freedom under the First Amendment i.e. for associating with the PSTA Union as a member and as a representative and for being friendly with PSTA President Bruce Edwards and for joining Edwards in lawfully advocating for PSTA members' rights, and,

b. For suffering unlawful retaliation for speaking out and complaining, as a citizen, and as a PSTA representative to the PSP front office, and to his union leaders, about arbitrary and capricious mistreatment of PSTA members and treating them differently than high-ranking PSP members under the First and Fourteenth Amendments and,

c. For seeking a redress of grievances wherein plaintiff filed grievances and sought relief from unlawful retaliatory mistreatment and unlawful harassment and because he utilized the court system for just and lawful purposes, and,

d. For suffering violations of his rights to the equal protections of the law as a PSTA representative (a protected class) and, all together with damages for pain and suffering, humiliation and embarrassment, punitive damages, fees, costs, attorneys fees, and such other relief as the court may deem appropriate.


Respectfully submitted,


s/Don Bailey
Don Bailey, Esquire
Attorney ID  23786
4311 N. Sixth Street
Harrisburg, PA 17110

February 2, 2009